So I'll call the only case, 21-70010, Holberg v. Lumpkin, Mr. Abernethy. Good morning, Your Honor. May it please the Court, David Abernethy for the appellant, Brittany Holberg. The jury that took 11 hours to sentence Brittany Holberg to die never heard that Ms. Holberg was exposed in utero to alcohol and hard drugs, born addicted, inconsolable, unable to tolerate being touched. They never heard that she was struck and shaken repeatedly as a young child, that she was exposed in her childhood to pervasive violence, rampant promiscuity in her home while her basic needs were neglected. They heard an unrebutted claim by the prosecution that her parents used a little marijuana, but a lot of people did that. They didn't hear the truth, which is that she was raised in a drug den where her parents cooked meth in a bathtub and where they furnished her, during childhood, with alcohol and marijuana. They did not hear that she was raped repeatedly, beginning at age 13, by an adult friend of her stepfather. They heard a very brief reference, which was savagely attacked on cross-examination, that she had been gang raped at one point, but they did not hear the facts, which were that she was gang raped, hospitalized, traumatized, wanting to die. They did not hear most of what the district court described as the stark evidence of her repeated sexual victimization. They never heard that two years before this homicide, she was found lying in an intersection, overdosed on drugs, delirious and psychotic, taken to the hospital, put on a suicide watch. They did not hear that because of the lifelong trauma that began before she was even born, she had severe cognitive impairments that were directly relevant to what happened, how this homicide came to be committed. I'm going to just state the obvious. This is focusing at the moment on the Wiggins claim, which does have recent Supreme Court authority. You've both 28-J'd it. It also, you would agree, we're looking at it through double deference, and the state court had a significant evidentiary hearing. Is that all fair to say? And there is a Supreme Court case law from just last week, which as we suggested in our Rule 28-J letter, in our view actually underlines the critical importance of the evidence that wasn't presented here. Because in the Thornell case decided last week, the court emphasized that the jury had already heard extensive evidence of the same character as what the defendant was saying should have been presented. Not true here. On some critical issues, including her early exposure to drugs, violence, and cognitive impairments, they never heard that. Would it be a fair characterization of the state court's ultimate conclusion on this issue, though, that despite a horrific background that wasn't the strategic focus at the punishment phase, experience counsel chose instead to say this murderous moment was an aberration, and they made a strategic decision to not press the immensity of mitigation to an Amarillo jury back then in the 90s that may not have seen much sympathy in a life of prostitution and drugs and abuse and suffering as an excuse? Do you see my larger question? It is certainly fair that the state court characterized this as a strategic decision by defense counsel, and it is absolutely true that under the Strickland standard and in the many cases that have followed, there is deference to the judgment of defense counsel and deference to the state court's determinations. But that deference, that double deference as it's often called, is not a rubber stamp, and it cannot justify the ultimate conclusion, which is not a fact finding but a conclusion as to the application of clearly established law from the Supreme Court. The ultimate conclusion that it was objectively reasonable for counsel to do so, it's not a rubber stamp. But in fact, there are many cases that are much closer to this case, Wiggins, Andrus, Rompia, Sears v. Upton, where many of the same kinds of evidence were not presented, and the court found that to be objectively unreasonable in many cases because as here for much of the evidence, not all of it because some of it was known but not presented, but for much of the evidence, it simply wasn't investigated, even though clearly established law, Wiggins in particular, required defense counsel to inquire into and investigate before making a decision, investigate the childhood abuse, sexual abuse, cognitive impairments, these same kinds of things. It's important, Your Honor, I think, to note that the state court record shows, and indeed the director has candidly conceded in his brief at page 29, defense counsel testified in the state habeas hearing, that they decided on their penalty strategy at the very outset before they even had investigators and before there was any investigation. Now, this was not a case where, and we're not contending that they had to turn the world upside down and search for things they had no reason to believe would be there. This is really Wiggins where, as I think the court suggested, the evidence was staring them in the face. One example, the defense counsel talked to the paternal grandfather. They found out that both parents, including the mother, were seriously messed up on drugs before and at the time that Brittany Holberg was born. They knew that the biological father was there. He would have knowledge of this. It wasn't a reasoned decision not to talk to him. The state court found as a fact that they wanted to talk to him and they could have talked to him because they knew where he was incarcerated. They never did. If they had talked to him, if they had looked into that evidence that was staring them in the face, they would have opened an entire world of mitigation evidence that they never learned and never presented. A history, extensive history of cognitive impairments, mental issues, drug addiction, abuse in prior generations, all extensively laid out in the habeas record by the paternal relatives that they never talked to. All they needed to do was look at the evidence staring them in their face, talk to the father, and that whole world would have opened up. Also, they had medical records, access to medical records. The extensive impact of sexual trauma, sexual violence was in those medical records, as was extensive corroboration of facts both presented and not presented. The director has argued in his brief, and he points to some of the evidence that came in at trial, that in fact there was evidence of some of the abuse, some of what Brittany Holberg experienced. But the rest of that story is that the prosecution extensively undermined and impeached that evidence, which to the extent it did come in, came in pretty much entirely from Ms. Holberg herself or indirectly from her through her stepfather, John Schwartz. There was extensive corroboration. Just so I can refine, the Wiggins claim is not disputing that there was an intelligent choice made. It's just that it's reversible. The state court's resolution of this after an evidentiary hearing is that that intelligent choice was made without having found why a different choice would have been much better. Is that it? Well, I would qualify that somewhat, Your Honor, because it was not an entirely intelligent choice because some of the areas of mitigation that would have been extremely powerful were not investigated at all. And I think the case law is clear that you cannot demand deference to the tactical judgments of defense counsel when those judgments are made. And what's just the best case? Because that is the crux of your argument. They made an intelligent tactical decision. This was a terrible aberration jury. She's an extraordinary person, troubled but terrible, as opposed to the entire life has had such phenomenal trauma. This violent moment was part of that violent life. You see? Right. Well, I think, Your Honor, that Wiggins certainly strongly… Wiggins is your… Do you have a circuit court application that's similar? Because I want to move you to the Brady case, just my own, but of course colleagues can compete. What's your best sort of, in this scenario, application of Wiggins at any circuit level? Well, one of the circuit decisions that we cite is the Walby case, which Mike Andrus found that it was objectively unreasonable and inadequate for defense counsel to focus exclusively on future dangerousness. And I think that's an important element of the Wiggins claim here. This was not simply a matter of choosing one line of emphasis over another. In point of fact, there essentially, as the court pointed to this as an issue in the opinion granting the certificate of appealability, there was, in fact, no real mitigation case made. Defense counsel expressly disclaimed in their opening in the penalty phase, they said, we will not get to question two, mitigation. The director has suggested in his brief that, in fact, defense counsel then put on a mitigation case, but I think if you review the record, Your Honor, it's clear that what they actually did was put on a future dangerousness case that could not be viewed as a reasonable choice, just as it was found not to be in Andrus and in Walby, where it was a very violent crime. There was other evidence that supported the prosecution's claim of future dangerousness. It was objectively unreasonable to put all the eggs in that basket. They did. Now, they did, at the end of the penalty phase, present what was described as a mitigation argument, but in fact it wasn't. There's no evidence discussed. They never presented any of the evidence, even the evidence that came in for other purposes that might have been characterized or argued as mitigation was never referred to. When you say there was other evidence that she would be a future danger, what are you thinking of? Well, there was evidence. The prosecution presented testimony that there were other incidents, not of the same character as this homicide, but other incidents of violence or threats that they attributed to Ms. Holberg. There was some ambiguous claim that she might have killed another person. In fact, he died of pancreatic cancer, but there was a case, and they had an expert. Do you mind if I move you to, and I can add time, it's a single case, but I'd like to move you to the Brady issue? Certainly, Your Honor. Okay. I'm happy to address it. Am I right that the ruling, the state court ruled on that as to claims 33 and 34, but there isn't much elaboration at the state court as to why the informant status wouldn't be Giglio impeachment evidence? Am I focusing on the right portion of the state court ruling we'd be asking? Is that inconsistent with clearly established Supreme Court law? I think you are, Your Honor. I would underline that there were two different claims related. There were. I know. And one of them is not before you. Yes. Well, I have a question about this, and it's a very basic question. It's a procedural question, and it has to do with your Brady claim is with respect to an alleged failure to disclose Kirkpatrick's informant status. That's the Brady claim that we granted a COA on, and that's the claim that you're arguing here, right? That is correct, Your Honor. Okay. There's a very big record, a very big state record. I'm having trouble finding in the state habeas record where a Brady claim with respect to Kirkpatrick's informant status was raised because Judge Higginson pointed to the claims I'm looking at, which are 33 and 34 in the state habeas record. I see claim number 33 is not a Brady claim. It is a claim that the prosecution elicited false testimony with promises to Kirkpatrick, and she testified falsely. And then I look at state habeas number 34, which is a Brady claim not with respect to Kirkpatrick, but with respect to Becky Bates. So I don't see in the record where a Brady claim with respect to Kirkpatrick's informant status was ever raised. Well, I would just quote, Your Honor, this statement in the post-conviction application at page 150, and it's in the electronic record at 1688, and I'll just quote it quickly. Kirkpatrick indicated she was a confidential informant for the task force or SWAT team. If that were the case, defense counsel was entitled to know that information. You're picking one phrase out of a 110,000-page record. What claim is that with respect to? You have to present the claim in state habeas in order to exhaust. So what claim? Is that number 33 or number 34? That is in number 33. Okay, number 33 is not a Brady claim. Well, Your Honor, I think that there was also a statement in the reply in support of the post-conviction application in the record at pages 1905 and 06. I'm just asking. I mean, I realize that the district court, the federal district court in this case, says in one sentence, this claim, the Brady claim, was raised and ruled on, but I can't simply rely on that. I have to look at it, and all the pages cited in the district court's opinion are with respect to not a Brady claim, but a Giglio-Napiew claim about a prosecutor supposedly intentionally fabricating evidence, but that was all subject to an evidentiary hearing by the state habeas court, and it was rejected. It's not a Brady claim, though. Your Honor, I think that it's our position, certainly, that the claim was adequately raised and preserved, and I don't think that the director has argued in his brief that it was not. Our law is that a panel can sua sponte raise a procedural default unless the state has expressly disavowed it through counsel, and so I'll ask them if they have expressly disavowed it through counsel, but the claim has to be procedurally exhausted. And I can't say anything further other than, Your Honor, if this issue, if the decision may turn on this issue, I would respectfully ask, since it wasn't raised by the state and wasn't briefed, that we have some opportunity to submit a supplemental brief to address it specifically. Well, sure, fair enough, but so we've talked about the claims that are raised and not raised. What about the state habeas ruling on this? Where does the state habeas court rule on a Brady issue with respect to Kirkpatrick's informant status? Well, the only statement, Your Honor, that I saw in the record with respect to the Brady claim was a statement, and I'm trying to find the site, I know that it is cited in our brief, where the state court said that there was a Brady claim which it was rejecting because there was an open file that was provided to the defense and that there can't be a Brady violation if the defendant has the information, but there was undisputed testimony from the police department that nobody other than the police department knew she was an informant, so that's clearly not important. Well, maybe you can do this on rebuttal, but I'm looking at the findings of fact and conclusions of law from the state habeas court, and I'm seeing, again, I'm focusing on the 33rd claim and the 34th claim, and I'm just not seeing a ruling on a Brady claim with respect to Kirkpatrick's informant status. I do see one with respect to Becky Bates. Counsel, I think those are important questions, and you've asked for the opportunity to brief it, and what I'll do since we're now at five minutes, I'm going to add ten minutes to each side so you can address the merits of the issue that we granted COA on, and we understand you would like the opportunity to brief whether the government has waived the waiver, and you've cited informant status was in issue 33, and Giglio may in fact be a subcomponent of Brady when it comes to impeachment evidence. So why don't you go ahead and explain to us, assuming, as the district court did, that the government didn't disclose that she was a paid informant, does that violate clearly established law as to either of the other two elements of a Giglio claim? In other words, materiality and favorableness. Well, Your Honor, I would say that the evidence that was suppressed was clearly favorable to the defendant. It's classic impeachment. This individual who gave uncorroborated testimony about explosive admissions allegedly made by Ms. Holberg was in the paid employee of the police department that took that statement. Depending on those police department's payments to feed her drug habit, this is all at the time the statement was made. Are you saying there's evidence that she was paid in this case for this testimony? There's no direct evidence in the record, Your Honor. There's no evidence in the record? Well, there is evidence from which you could certainly infer a connection between the two. Why don't you tell us the best evidence, that she was paid by the same prosecution team at the same time. Is there evidence to support both those propositions? Her handler, who paid her regularly for being a drug informant, took her directly from the jail cell that she shared with Ms. Holberg to another Amarillo Police Department officer who then took the statement. He then got her bonded out of jail the same day, one of her charges dismissed the same day. And when you recite this, just remind me where this is coming from in the record. And the critical two points are, she was not just an informant, she was a paid informant, and she was being paid three points at the same time and by the same prosecution team. Do all three of those points exist in the record? Yes, she was paid by the same police department supporting the prosecutors in the murder case. And that's where? 10675455 and 5-9. She was using the money to feed her drug habit, depending on the police for that, 106755. They took her directly from jail to give her statement, 29884 to 8-6. They got her bonded out of jail and dismissed a charge the same day, 29756, 106754 and 5-5. At trial, testimony was elicited by the district attorney that she was there as a purely disinterested witness, just wanting to do the right thing. In fact, as the district attorney had the letter, she had written to the judge. Okay, now stop there, because I don't remember that in her direct testimony. The DA elicits on direct from Kirkpatrick that she was disinterested? She wasn't looking for anything for herself. She just wanted to do the right thing. Okay, because that would elevate a Giglio claim to a NAPU claim, right? They stood silent while she said she was disinterested, and yet they know she's being paid. Right, that's in the record at 8618-19. Part of the difficulty, of course, in any AEDPA double-deference case, even if there isn't procedural waiver, is there's got to be clearly established law, and the world of Giglio impeachment has bedeviled prosecutors, fair to say. In other words, the full orbit of what's material and favorable. Am I right that materiality really, we all know what materiality is legally, it's just case-specific. Would it have made a difference to this outcome? For me, the challenge in this case is, is it clearly established that knowing an accusing witness is being paid by the government team, that that's favorable to a defense jury? Now, you may laugh, but you have clearly established law that says it, other than banks, where it was being paid in the same case. I don't have a case like banks where there still was evidence that the individual was being paid for the very murder case in which the testimony at issue was being given. My argument is that the clearly established principle in banks is that informant testimony by a paid informant of the same police department is inherently suspect and impeaching, consistent with the well-established principle of evidence law accepted in Texas and everywhere, that a witness in the paid employ of a party that suggests bias and is impeaching, and that in fact, AEDPA, to get clearly established law, does not require identical facts, and that the fundamental principles of the holding counsel, let me make a short explanation to you. I thought the argument was that she functionally was compensated. She was a paid witness because you, as I read this record, the first thing that happened was that she as a paid informant, with a history of being paid informant, was immediately transferred into that cell where she was, just by happenstance, the day before, and then within a very short period of time came out with her statement. And then, using that disclosure and benefit, she cashed it in. She received substantial benefits with regard to dismissal of other cases, et cetera. So I thought your argument was that that functionally is, she was a paid witness. They didn't pay her in front, but they put her in there, put her in the cell. How coincidental is it that within two days, they put her in the cell? And then she comes back and cashes in. Now, whether that's enough or not, within the doctrine of the separate court, I'm not sure. But I thought that's what the argument was. Maybe I misunderstood it. All true facts. The only thing that I would have to say I don't have is direct testimony from law enforcement. We were giving her benefits for the specific purpose of inducing her testimony in this case. But all the facts that you've indicated... There were evidentiary hearings on this at the state habeas level. There are fact findings that she did not testify falsely on inducement from the prosecution. It is true. It's with respect to a different claim, the claim under Claim 33. But there are fact findings with respect to that that reject this as a factual matter. And yet, we're not talking about that because you've raised a Brady claim with respect to this. So that's where it's a fundamental disconnect I have. I do, Your Honor, read the factual finding in the state court slightly differently. The factual finding in the state court was that there was a contention that Ms. Kirkpatrick... The district attorney gave an affidavit that said, I didn't do that. I didn't present any testimony I knew to be false. The state court found the district attorney credible over her. But I do not read that finding as a finding that her testimony at trial was substantively true. How could it be anything other than... There was a hearing on that with respect to a claim that's not a Brady claim. But there was a hearing on that nonetheless. And it was rejected as a factual matter. But we're not here talking about whether that was an unreasonable determination in light of the facts. Because you've raised a different claim, a Brady claim. And for purposes of the Brady claim, Your Honor, I would submit that the relevant issue is not whether the state habeas judge believed that Ms. Kirkpatrick's trial testimony was true or not. But instead, whether there is a reasonable probability that a jury would have seen it otherwise if the defense had been given the impeachment information and had impeached her at trial. And I think that is so in significant part because all of her testimony was entirely dependent on herself. It was not corroborated by anyone. And in fact, there was testimony at trial that undermined it. She said Ms. Holberg was a monster who reveled in the killing and had no remorse at all. And all of the other cellmates saw an entirely different Brittany Holberg. So if she had been impeached about all of the benefits and about the lies she told that she wasn't seeking anything, because she wrote to her own judge in her case and asked for leniency based on the work she was doing for the case. So let's you seem to be talking about materiality now of the whether whether she'd be impeached. Would it make any difference? I mean, one thing we have just sort of glossed over in this case is the crime itself. I'm assuming or you can tell me absent Kirkpatrick's testimony with the jury still have learned that Mr. Tower was 80 years old. He weighed 162 pounds. He was five feet, six inches. He was stabbed 58 times in the head, the face and the body. He had a chipped skull. He had a pulverized nose. He was stabbed. He was hit with a hammer, three forks, a butcher knife, a grapefruit knife, a cast iron skillet and a steam iron. And he had a lamp shoved five feet down at five feet, not five feet, five inches down his throat. Now, I don't recount all that just because I like to say grisly things. But surely the jury would have heard all of that and did hear all that totally apart from this Kirkpatrick's description of what Holberg allegedly said to her in prison. Right. They would have heard that evidence. And I believe that much of the evidence that wasn't presented that we were talking about in terms of the Wiggins claim would have put those facts in a very different context. But the testimony that she had no remorse, celebrated the killing, those uncorroborated claims of admissions were, I would submit, critically important to the jury's determination on sentence. Not on guilt of the homicide, but on sentence. I mean, I'm focused on guilt and maybe answering the materiality would help me, too. When did the government bring up Kirkpatrick? Opening, cross of Holberg, closing, you probably know that. But I thought specifically, perhaps, my understanding of your brief was that there was no other witness that could actually make it a federal capital case. I mean, a capital case. Because she's the one who said robbery. She is the only one. If you can impeach her and say that little puffery, as the government suggested in closing, actually is made up because of bias, that would have made a huge difference to the guilt phase. On the issue of capital murders. Right. Because of the intent to rob. Are you saying there's no evidence independent of Kirkpatrick that he had $1,400 in his wallet and it was gone? There was evidence that was conflicting on what money he had, what money she had, where she got it. But Ms. Kirkpatrick was the only witness who provided direct evidence of that intent. And, in fact, the state specifically cited her testimony as the legally sufficient evidence on direct appeal that supported the intent to rob for capital murder. So I would suggest it was very important to that point, but also very important to the point of sentence. Your Honor, if the court would permit, in the last minute or two, there was one or two points I did want to make on the Wiggins claim. The argument, there's an element of, there are several elements of this claim that go beyond simply not investigating and not presenting all the evidence. Defense counsel not only didn't present all the relevant evidence, they, in fact, affirmatively joined onto the false narrative that the prosecution gave. They presented Ms. Holberg as a bright girl who had a loving home, specifically said loving home in the penalty argument, who just didn't get enough guidance, left home too early. They presented her as a bright girl who had been accepted to a Duke University program, totally untrue. She, in fact, had been broken by years of sexual, physical, and emotional violence, and they presented, they endorsed the prosecution's false narrative of a good childhood when they should have been rebutting it. And critically important to the sentence, the prosecutor could tell you that himself. They argued in closing, there's no mitigating evidence here. Everything was handed to this girl on a silver platter. She had a good home, good upbringing. They understood that if the jury actually understood the reality of her childhood, they would see that as mitigating and likely spare her. I think there's clearly on this massive record a reasonable probability of a different result on sentence if this evidence had been presented. And I would note the district court characterized the evidence in a different way, said a lot of it's double-edged. One of the things the district court said was it was reasonable for defense counsel-wise, perhaps, to not present evidence about the stepfather's friend having sex with her when she was 13 years old because it would put her in a bad light as a sexual relationship of someone who was promiscuous. It wasn't a sexual relationship. Are you referring, when you say that, because I've read the district court's 322-page opinion and the district court has footnotes that go on for pages and pages about all the evidence that was available to defense counsel about her upbringing, her very difficult life, and yet they decided not to present it. And they had a strategic reason for doing that, said the district court, that it was double-edged. This evidence was double-edged. One could easily imagine the prosecution saying, well, what we have here is somebody who is unredeemable, who has been programmed through a terrible life to do terrible things, and this is what she did. I mean, that's what the district court found, right? If I could, I know I'm not- Yes, go ahead. Just share one thought. If you take a look at the district court's opinion, the district court says this evidence was double-edged, it wouldn't have helped or it wouldn't have mattered. Read the district court's appendix. I'm not going to address the issue of whether the appendix talking about clemency was within the district court's purview. The point I want to make is the appendix presents a powerful explanation for why this evidence, in fact, presents a powerful case for mercy, and there's no logical reason why the human beings in the jury box would see it any differently than a board or governor was. It was powerful evidence for mercy, and if the jury had heard it, at least one of those 12 would have voted to spare her life. I thank the court's indulgence and the additional time. Thank you. You still have time for rebuttal. Thank you, Your Honor. Mr. Bragg? Now, I added 10 minutes, correct? So would it be 40 or 30? Oh, it's a 30%. Thank you. May it please the court. Mr. Cowery was a feeble 80-year-old man. Let's start right away with the issue that you didn't brief, and I take it you didn't argue to the district court, and it may be you're with an outstanding office that you didn't want to pursue an execution on a theory of procedural bar. But is it correct that you have not argued to the district court or to us that this giglio claim was procedurally barred? That is correct, Your Honor. I would, with the court's indulgence, I would clarify that right now we are here for only a Brady claim, not a giglio or nepew claim. We are only here for a Brady claim. But you're not saying it's been procedurally barred, waived? The director has never argued that, Your Honor. Are you affirmatively disavowing the argument that a Brady claim with respect to Kirkpatrick's informant status is procedurally barred? This is a complicated question, Your Honor, and I would like to try and clarify it by putting the picture in the room, if I may. In the state court proceedings, Holberg's claim, in fact, really up until the merit stage of this case in this court, Holberg's Brady and giglio nepew claims with regard to Kirkpatrick, as well as a host of other witnesses, is that the DA, not the district attorney's office, but the DA himself, who is the lead prosecutor in the case, coerced Kirkpatrick, as well as other witnesses, into testifying with both carrots and sticks, providing her the information that she was supposed to stay on the stand. Not that it was Kirkpatrick lying up, making stuff up in her own brain, but that she was told by the DA what to say. One quick question here. Yes, Your Honor. In the papers, I saw that a district attorney withdrew from the case. Yes, Your Honor. During the state habeas proceedings, once these claims were alleged, and these claims were not only far in reach, Why didn't the district attorney connect it? He withdrew rather than deal with it. Well, Your Honor, he believed that it would serve the state the best. Yes. Excuse me. No worries, Your Honor. In fact, that is where my office came into the case. That's where I came into the case for purposes of the hearing on the IATC claim. You were just saying, so the Brady slash giglio, two sides of the same coin claims,  Yes, Your Honor. And what I would say is the reason why the director in federal court has not asserted the procedural bar is because I think it is fair to say. Certainly, the facts supporting the claim as it exists now are present in the state court. They submitted the testimony from Kirkpatrick's own case where she testified. Corporal Stallings testified, who was the quote unquote handler. The district attorney himself testified. Well, let's just look at whether or not the state courts. I appreciate that. The state court violated clearly established law in its resolution of the giglio Kyle's Brady claim due process. Yes, Your Honor. Could I just finish that question? There are three elements to a claim. And at the moment, the district court assumed the first element. Okay. So which of the two other elements would you say the state court's denial of the giglio claim, which of the two other would you say isn't consistent with clearly established law? I want to be clear, Your Honor. Again, this is where it becomes a little bit muddy. But the state court, or excuse me, the district court assumed suppression of the evidence regarding just the paid informant status outside of this case. It did find that there was no paid informant status in this case, which is necessarily why Holberg cannot overcome D1 analysis now. It's why the state court's analysis can't be found to be violating of Supreme Court precedent. Because there is no, as Your Honor has well noted, there is no Supreme Court case that looks anything like this case. Banks is nothing like this case. But which prong of giglio are you saying it looks nothing like it? In other words, let's go down the other two that link. That's right. Are you disputing that knowing someone is a paid informant by the same prosecution team would be material in the outcome, would have a reasonable probability of changing the outcome? Well, let me actually focus first, Your Honor, on the favorability question if I can, because I think it goes more to favorability about whether or not that particular piece of information could be favorable. And what I would say is it vastly depends, Your Honor. If it's banks, absolutely. If the person was paid to serve not only as an informant in the case, but an active participant in the crime in the case, to almost induce the defendant's performance in the crime in that case, that is certainly favorable and material. Here, you know. It's not biased evidence? It wouldn't be admissible and favorable under 608 and 611 to know that the same prosecution team is actually paying their lead accusing witness? Well, to be clear, Your Honor, the prosecution team, the attorneys, were not the ones paying. They even said we were not aware. But it's clearly established law that it's one. Yes, Your Honor. Absolutely, Your Honor. So if that one team at the same time is paying her, you're saying that that wouldn't even be favorable to impeach her? If she's in a capital case, the witness is saying that the defendant has sentenced herself to death by her own confession, and she's the only one to earn the confession, she's the first one that Holberg comes out of the apartment and sees, how would that not be favorable for the defense to be able to cross-examine her? In fairness, Your Honor, I think it would be favorable. But now that's where I'd like to turn to materiality, and that's why I wanted to put that in front of you. Okay. So we've knocked out favor, Bill. Of course it would be favorable to be able to cross-examine she's being paid by Sam. So material, and it is true in rebuttal closings that the government said to the jury, well, you heard one person describe the, quote, butchery of the defendant. Now, other stuff about the fountain of blood and liking the scene of blood, that was puffery. But you can trust her because of her details about the butchery. That's closing rebuttal. How could that not be material to be able to cross-examine and say, well, of course they're saying that, because they're paid by the government. How is that possibly not reasonable? Because, Your Honor, I'm sorry. No, no, no. You're being polite, and I go on. Because, Your Honor, Ms. Kirkpatrick was the last witness in a very long day of testimony. Her testimony lasted 19 pages. Holberg's testimony lasted 256 pages. The jury heard directly from her about the butchery, but more importantly – Okay, but stop there. Didn't Kirkpatrick go before as the government's case? Yes, Your Honor. So the whole theory of Giglio, Holberg had to take the stand, because someone else had just said she convicted herself with her own words. Had you disclosed the credibility information, Holberg may not even have to have gotten slaughtered when she took the stand, because there would be no one saying, this lady confessed to capital murder. And, Your Honor, that's belied by the testimony that was given during the state habeas hearing by both attorneys who said that not only was it Holberg's decision to take the stand well before trial, but it was also Holberg's decision to present a self-defense case. She might have changed her mind if the jury had heard that the one person that's saying Holberg confessed to capital murder, the one person that heard that, she's on the government team. She's a government actor. Do you remember, here's the question, how long was the cross-examination of the only, in a capital case, witness saying the woman herself admitted to just enjoying the butchery? How long was the defense cross? How many pages? It's about half and half, Your Honor. Six pages long. Okay. Can you even remember what they were able to impeach her with? Well, they did impeach her with the fact that she did have a current case in Randall County. So imagine the impact. The jury doesn't just hear she's got pending charges from the handlers, but she's being paid by the handlers. You put those two together, you might think, well, wait a minute. There might, this, how do we know a robbery occurred? How do we know it wasn't the old man violently assaulting her? Did Towery's relatives testify that he had $1,200 to $1,300 in his wallet? Not only that, Your Honor, but I would really like to get to the robbery question, Your Honor, because I think that is truly what is most crucial about Kirkpatrick's testimony. The reality is the best evidence of robbery is not only from Holbrook herself in her own testimony, where she testified that she took money from Towery. She testified that she took at least one to two $100 bills from his apartment after the murder, but also the uncontroverted testimony that his apartment was full of prescription medications that were not there after the murder. So she at least stole those, Your Honor. There was at least uncontroverted testimony regarding that part of the robbery, but again, Holbrook's own testimony is that she stole money from Towery's apartment after Towery was dead. Again, and as Judge Duncan pointed out, there was ample testimony about the fact that he was carrying around $1,400 in cash to buy a car. His wallet was found open on his chest, completely empty of cash. Also, there were other witnesses that support the idea that Holbrook stole money, such as Cody Mayo and Misty Vitale. These two gave Holbrook a ride after the crime, after the murder occurred. They testified that she was carrying a wad of $10 to $20 hundred-dollar bills, which matches up with the testimony from the Sons that he was carrying. If this is materiality, would you agree that everyone knows materiality tests? Reasonably likely that the outcome would be different. Yes, Your Honor. So no one's really saying clearly, violating clearly, we know that we have to dive now into the test. Did you use Kirkpatrick in opening argument? The State did not, no, Your Honor. The State did not? Are you sure of that? In opening arguments, yes, Your Honor, the State referred to Kirkpatrick in opening arguments. Did the State cross Holbrook using Kirkpatrick? Yes, Your Honor. Did the State in rebuttal make the statements that I stated to you, the words the jury heard? Yes, Your Honor. In closing rebuttal, yes, Your Honor. But you're still saying you can think of a materiality case? Yes, Your Honor. What's the materiality case where the evidence that wasn't disclosed is that the accusing witness on a confession in the capital case, that's actually not material to the outcome? I think that it only can be material if, one, there's a couple of things, Your Honor. One, she was, to the degree that the defense wanted to impeach her, they had some impeaching evidence. I think, frankly, very good impeaching evidence. You have a current case in Raynald County, don't you? Ergo, wouldn't it be beneficial to you to answer the State's questions the way they want you to? The jury didn't believe that, clearly. Now, also, there was other evidence, and there are ample cases that talk about where there's other evidence, where the evidence that the witness provides is echoed by other witnesses. There's other evidence to support that that completely undercuts materiality, Your Honor. And here, where the jury heard from Holberg's own mouth, and again, both trial attorneys testified that well before the trial, frankly, I don't think she would have, Holberg would have changed her mind, given the way the trial counsel talked about how they really tried to talk her out of the idea of pleading self-defense and really tried to talk her out of the idea, as most defense attorneys would, of taking the stand. That was her decision, Your Honor, and she testified for 256 pages over two days. So, I mean, you've said it was favorable, so I won't pursue those line of cases. You're familiar with U.S. v. Abel? That's the case where gang membership came in, and I think the Supreme Court said it's favorable to just even know two people are on the same team. The theory here is she's on the same team. She's paid by them. Yes, Your Honor, but— Go ahead. So that's why I think I agree with you when you say this was favorable. We now have our focus just down to materiality. Sure, Your Honor, but then I would remind the court that Holberg's claim for decades now has been not that Kirkpatrick herself was making this stuff up and just testifying on the stand, stuff that she was carrying in her mind. She was told, instructed by the district attorney, threatened by the district attorney. The district attorney is the one that told her what to say. The state habeas court found that that was not true. The district court agreed and found that that was not true. And this court, in its COA decision, agreed with all of that. You did say they had a grab bag of carrots and sticks, and so there were the sticks, but there's also the carrot. We're paying you. But not in this case, Your Honor, and that has to mean something. That has to matter here, Your Honor. We were talking about a claim that's not in front of us. The claim that she was paid to fabricate testimony, that was a claim that was brought in state habeas. It's claim 33. It's not a claim that's in front of us. If it were in front of us, we would be talking about whether there was an unreasonable determination of the facts made because there was a fact hearing. It had to do with the veracity of Kirkpatrick's deposition testimony where she said, I made it up. Nope. State habeas court said that's not true, right? But we're not talking about that claim. So I'll ask you again. I ask the other side this. Where can I look in the state habeas court's fact findings, conclusions of law, and find a Brady ruling, not a Giglio ruling on whether the prosecution elicited paid for false testimony, but a Brady ruling with respect to whether the so-called informant status was disclosed and whether it was material? Where can I find that in the state habeas court findings? You will not find that specific finding, Your Honor. Because it's not there. That's correct, Your Honor. Okay. Just so I understand your rule of law for Texas prosecutors, even and especially in a death penalty case, your theory is the government can withhold evidence that their lead accusing witness reciting a confession. In banks, it wasn't a confession and it wasn't a death penalty case. But we're focused on materiality because we've gone past suppression and we've gone past favorableness. Your answer is that Texas prosecutors can withhold that they're paying the lead accusing witness because it wouldn't have mattered if the witness says, I have charges pending against me. Is that a fair description of what your materiality rule is? No, Your Honor. About whether or not lead prosecute, well, it is certainly, it's a little difficult to answer that question, Your Honor, because, of course, in Texas there are other guidelines that determine what a prosecutor must and must not turn over. Not constitutional. Correct, Your Honor. So Texas elevates from the floor. Correct. So does the Department of Justice. Yes, Your Honor. So you're saying this would get turned over on what, and I'm not familiar with Texas' equivalent of the U.S. Attorney's Manual, but this would have been turned over on, in Texas it always would, but it's not constitutionally turned over. Is that what your answer is? Now, post the Michael Morton Act, Your Honor, that extremely expanded and elevated what a prosecutor must turn over and must disclose, I think it would probably have to be disclosed, or it probably would be disclosed under the Michael Morton Act, Your Honor. But, again, here, I think that that might affect, say, suppression, but it doesn't affect the materiality argument. And I would really quick, Your Honor, quibble with, because you just said that she was the state's key witness, but I don't understand that she is the state's key witness. Why she testifies at the end of a very long day after several witnesses have already gone, she's almost towards the end of the state's case, and her testimony is 19 pages long. Well, I mean, you've been a prosecutor, I was a prosecutor for 20 years. You lead, you finish with the big impact, which is, this woman told me she butchered the victim. That is your lead statement. And elsewhere you described her, or the state courts did, as she was a key government witness. The CCA on direct appeal in a sufficiency claim, it was actually sufficiency regarding the punishment case, Your Honor, not the guilt-to-innocence case, but they did use that term. I will be honest, I can't square her being a key prosecution witness, but that is something the CCA said. That said, it was under a sufficiency claim, and there we know that the analysis is very different than a Brady claim, where we give all the weight and testimony, the most benefit that we can. Would you, I mean, you as a prosecutor, there's no better evidence in a criminal case than the defendant confessed. That is true, Your Honor, except for the fact the defendant confessed herself on the stand. And more importantly, Your Honor, it's worth noting that if she is the key prosecution's witness, why does the state spend a significant portion, maybe not significant is the wrong term, but a not small portion of the closing arguments disavowing the statements that she said Holbrook said, the fountain of blood testimony, the fact that she enjoyed it. The prosecution completely undercut all that, intentionally so. It understood correctly, the prosecutor, the district attorney himself understood that that was puffery, and he did not want the jury, he did not want to attain a guilty verdict, and in fact, even in punishment when he's talking about this, he explains to the jury, I don't necessarily want to get a death sentence just based on that testimony because I don't think that's real. I don't think that's real. What I do think is real is that Holbrook stabbed and butchered a man 58 times. All of the stab wounds, the chip in the skull, the broken nose, all of that was testimony that comes separate apart from Vicki Kirkpatrick. The 45 minutes that it lasted. The lamp post five inches in the throat that nicked the corroded artery, did that only come in through Kirkpatrick? No, Your Honor. In fact, there was pictures of that, very gruesome pictures that are in the state court records, and there are, in fact, pictures of all the injuries that he sustained. Very gruesome, very brutal attack, and if I could, Your Honor, just quickly note. Judge, just one quick question. Oh, yes. As I understand it, this case was tried up near Amarillo. Where was it tried? In Randall County, Your Honor. Okay. So, yes, Your Honor, in Amarillo. But, of course, Amarillo is, the reason why I say Randall County is because Amarillo is bifurcated. It's a rather important frame for understanding what the district court had a pretty good grasp on that. Yes, Your Honor. And, in fact, well, let me just quickly say that another thing that Kirkpatrick did not know was that the assault lasted over 45 minutes. The other thing that Kirkpatrick did not know and did not testify to was that at one point in Holberg's own description of the assault, she is standing with the door feet away from her. Mr. Towery is lying, beaten, stabbed, bleeding from the stomach area in his chair. And remember, this is a feeble 80-year-old man. This is not an Olympic sprinter. And she was asked specifically, why didn't you leave? Why didn't you walk out that door at this point in the attack? And she says, I wish I would have. That testimony doesn't come from Kirkpatrick. Well, when we look at materiality, it's Kyles v. Whitley, correct? Yes, Your Honor. Okay. And so the Supreme Court very specifically said, you don't ask would the result have been different if they'd had it. You ask, is it fair not having had it, the information? My point is, again, Holberg might not have testified. We'll never know, because they had no information to impeach her on, six pages of information, leave it out there, you've got a charge against you, instead of this prosecution team is paying you. Again, Your Honor, I would disagree with that, Your Honor, based on the trial counsel's testimony during the state's hearing. Would you agree that it is sort of the molten core of due process that the government's got to tell if their accusing witness is part of their team? Would you agree with that character? Yes, Your Honor. Okay. Originally, because the cases that predate Banks, like on Lee and Hoffa, the Supreme Court, you remember those cases, was struggling whether we would ever let an informant testify, at all. Yes, Your Honor. And then the court said what? They can, provided we have the crucible of cross-examination. But here, there was no cross on her informant status. Agreed, Your Honor. But again, I think the court has to distinguish between being on the same team in this case and having had some prior pre-existing relationship. You know what? Sure. You know what, all this speculation, which is what it is about informant, was she on the same team, was she paid in this case, was she paid in another case, what did she get as a result of it, all this stuff, this is just speculation. You know how it wouldn't have been speculative? If the claim had been raised in state habeas. If the claim had been raised in state habeas, then there would have been an evidentiary hearing on it, just like there was on the claim that was actually raised. And if there had been an evidentiary hearing on it, then we'd have fact findings on it. And then, on federal habeas under AEDPA, those fact findings would be presumed correct. But we don't have any of that here. That's why we're speculating about informants and who was on the same team and all this stuff. And to the degree, yes, Your Honor, with one caveat that I did want to include, that to the degree that the court were going to undertake a procedural bar analysis, it is important to note that there are still relevant fact findings that would be on this claim as it currently exists that would get deference under E1. Oh, I know, I know. that was given during Kirkpatrick's own trial where she said there was no deal in place, where the DA said there was no deal in place, that any relationship that existed with Corporal Stallings regarding being paid for testimony about other drug cases did not impact her testimony here. Oh, there are lots of facts. Yes, I agree with you. There are lots of fact findings with respect to Kirkpatrick and the allegation that she was paid to fabricate testimony. They're in this record, and they're with respect to a different claim, Claim 33 in State Habeas, which is not a Brady claim. Yes, Your Honor. I'd like to quickly turn to the Strickland claim. The court should affirm because trial counsel indeed conducted a thorough investigation. Based on that, they made a reasoned choice of what their case would be, and the jury heard the vast majority of evidence Holberg now repackages. As to the new evidence, it is simply belied by the record. Further, it is also a different retelling of the same story. Now, I would like to go back to the beginning of my colleague's argument where he was trying to list out several things that the jury did not hear. For example, he said the jury didn't hear that she was raised in a drug den. In fact, the jury heard ample testimony about the drugs that were present in the house, that her stepfather, John Schwartz, and her mother abused drugs while she was there. They heard testimony about the fact that she ran away from home and didn't want to go back to that house because it was such a difficult place to live. Please understand, there's been some, I think, quibbling about whether or not a parent can love a child, whether or not a parent can try and do their best with the own demons they face to raise a child. It's one thing to say that John Schwartz abused drugs. That's something that was present before the jury. It's another thing to say, as Holberg has said for the last couple of decades, that John Schwartz sexually abused her. And there is not only is there no evidence of that, but there is evidence during the time of trial that absolutely rebuts that. Notably, Holberg's own interviews with her trial team, Holberg's interviews, multiple interviews with her expert, as well as interviews and testimony from other family members. There was absolutely testimony regarding the rapes and assaults that she suffered. My colleague mentioned a rape by a friend at the age of 13. In fact, it was a rape at the age of, it was a sexual assault by a friend at age 5. I know that because Holberg testified about it. There was testimony about the sexual assault that occurred when she was 18. That's the gang rape in the back alley. There was testimony about the assault that she suffered in Oklahoma when she was running in the woods. And again, not only did this come in through her during the guilt stage, but it came in through ample witnesses during the punishment stage. Indeed, I believe my colleague suggested that Holberg and John Schwartz were the only people to testify about this. In fact, Teresa Lynn Cobb, Christy Samperi, Pat Carnes, all testified to varying degrees of this. But most importantly, Holberg's expert, Dr. Patel, testified about this and about the impacts it had on her life in diagnosing her with PTSD and battered women's syndrome. Remind me, just I'm trying to connect the two claims here that are extant. Did the government at the sentencing hearing similarly say you can't rely on Kirkpatrick as to glee in the blood and she'll do it again? In other words, was the government citing Kirkpatrick at the punishment stage for likelihood of recidivism? No, Your Honor. In fact, the government didn't mention Kirkpatrick at all. At all at sentencing? Correct. Okay, that's... At least during the closing arguments, Your Honor. I apologize. I don't believe I've reviewed the opening statements, but I don't recall Kirkpatrick being there as well. Nothing, they didn't rely on her for remorselessness or future natures at either point. No, Your Honor. That's helpful. Thank you. Trial counsel immediately began investigating Holberg's background and her family. The day they were appointed, they conducted an interview with her mother, Pamela Schwartz. A transcript of that interview is in the state habeas record. I'm sorry, my brain's still going slow. Yes, Your Honor. Because you made an array of materiality arguments pertaining to guilt. Yes, Your Honor. You wouldn't have to if she was of no influence at sentencing. But if she were, if she'd been cited, you'd have to then explain why a capital sentence would still be the same but for reference to her. So it's pretty important that your memory is correct that she was not invoked at the sentencing stage. That's fair, Your Honor, yes. Go ahead with your argument. Trial counsel interviewed Pamela Schwartz. That interview, a transcript of that interview is in the state habeas record. Within a month, they conducted two separate interviews with Holberg. Both of those are also in the state habeas record. It's not to say that these are the only interviews they conducted. It's just that early on, especially where there was only one trial attorney present during these interviews, they said we want to have an audio recording of this interview so I don't have to sit there and transcribe notes and forget something or miss something. They then had those transcribed afterwards. But these interviews as well as others are in the record. They detail a lot of the mitigating evidence that Holberg now points to, specifically the sexual assaults, the drug use that was in the home. Would you speak to the case he said was a strong application of Wiggins-Walby? Are you familiar with that? I'm not familiar with that case, Your Honor. Yeah. But I would like to point out that this case is a 1997 case in Amarillo. Wiggins doesn't even come out for another six or seven years. She's only been in death row for 22 years. Is that right? Her conviction is 1998, Your Honor. I ought to be able to do math a lot quicker than I am right now. 6-26, I believe, now is where we're at. But, Your Honor, I would also like to point out that regarding the breadth of the investigation, Garrison, the lead investigator, for all intents and purposes, Kathy Garrison, testified at length about the depth and breadth of the investigation, where investigators interviewed countless people from bars, strip clubs, and corners where Holberg worked. They traveled to Oklahoma, to Arkansas, and to Tennessee to try and find potential witnesses they could use both in the guilt stage and mitigation stage.  And it was clear that there was billing records, mileage records, travel logs, notes showing all this happened. Trial counsel also collected a massive amount of records. Dr. Patel himself testified at trial that he reviewed medical records, school records, safety records, criminal records. Trial counsel also testified during the state hearing as to all of the records that they collected and gave to Dr. Patel. Based on these records and two clinical interviews that Dr. Patel conducted with Brittany Holberg, he diagnosed her as having PTSD and battered women syndrome. He made no mention of any possibility of genetic brain disorder. He did not encourage them to look at that. Indeed, what he said, that any perceived degree of impact on intelligence was actually the result of extensive abuse of crack as well as other drugs and alcohol. Holberg's state habeas counsel, and it's important to note that the same firm that's representing her here in this court was also representing her during the state habeas proceedings, they created a summary of the mitigation evidence they found during a review of trial counsel's files. That summary is 180 pages long. You can find that summary with their exhibit 145 at the state habeas hearing. 180 pages. In that 180 pages, you heard my colleague mention the in utero drug use. The only evidence of in utero drug use comes from the paternal grandfather, the biological paternal grandfather, who admits that he was not there during the pregnancy. He was not there during Holberg's upbringing. Indeed, he said that he did not meet Holberg until she was 18 years old. He simply said that the biological father and the mother used dope. The Supreme Court's decision that you both said to us from last week, that doesn't strengthen, weaken, it doesn't affect the analysis of the Wiggins claim? Well, Your Honor, I certainly would say this, that Judge Alito did not necessarily break any new ground, I did not break any new ground in terms of Strickland or Wiggins analysis, but I do think one, the Supreme Court case that seems to line up particularly with the analysis this court's going to have to engage in, but I would say that a lot of what is discussed in this case about what the trial court heard versus what Mr. Jones is now presenting is eerily similar to the case here. The trial court in that case heard that Jones was abused as a child, began using drugs and alcohol at age 13. They heard from Jones's second stepfather that Jones had a troubled personal life. Again, remember, the jury here heard from Holberg's stepfather. They heard that Jones's grandfather and uncle had introduced him to drugs as a preteen, again, relevant here. From this, the trial court heard that there were, found there were four mitigating circumstances, that Jones suffered long-term substance abuse. The court did find that there were problems that may be caused by genetic factors in head trauma. I'd like to come back to that in a little bit. And that he was under the influence of alcohol and drugs at the time of the murders, and he was abused as a child. Now, of those four things, I know what my colleague's going to say. He's going to be like, yeah, but there was evidence of genetic factors in head trauma. And he's going to say, but there's evidence here. That evidence, and it's really the only truly new evidence that they can bring, is Dr. Young, a neuropsychologist who has diagnosed Holberg as having a general learning disability, general genetic brain dysfunction, and possible exposure to alcohol and drugs in the womb. That's it. That's the diagnosis. That general genetic brain dysfunction. And, again, what I would remind the court is that it is based in large part on review of the same records that Dr. Patel had. It's based on a clinical interview that she conducted. Dr. Patel conducted two clinical interviews of Holberg. At some point, trial counsel gets to rely on their expert. And, indeed, that's what they did here. After conducting a thorough investigation, presenting their expert with a massive amount of records, they relied on his analysis, and then they engaged in creating and crafting what their theme was going to be. And, certainly, I know my colleague said that we admitted that trial counsel picked their theme too early. It's certainly in the record that trial counsel was starting to think of their theme, again, after having already interviewed Holberg, her mother, several other witnesses. They started to think of their theme. They were not dedicated to that theme, despite the discovery of other information. But, ultimately, it's key to note that the two trial counsel and the main investigator, all three of them testified to this idea that at that time, in Amarillo, presenting the case that Holberg would now ask them to present, someone that is irrevocably broken, especially because of drug abuse, is worthy of a life sentence and not death. That absolutely would have failed. They said that based on their long experience practicing in those courtrooms, practicing in front of those juries, doing not only murders, but also multiple capital murders. I think we know something about that. Yes, Your Honor. I understand. I will then move on. I apologize. You had an argument, at least several pages in your brief, about the appendix from the district judge where the district judge is suggesting to Texas to show clemency. Yes, Your Honor. What's the legal basis that you're asking us to strike that on? Well, it's a little bit difficult to say because, frankly, Your Honor, I've never seen such an appendix. I don't know what the legal basis that the court had to write such an appendix. I guess, frankly, the best legal basis that this court should strike it on is a jurisdictional one. The court only has jurisdiction to opine on the issues that were before it. This was not a claim that was raised, and certainly a federal district court does not have the ability to opine or write an opinion based on what the governor should or shouldn't do when it comes to clemency, a clemency determination that will come years down the road. Thank you, counsel. Quickly, returning back to the Wiggins claim, again, trial counsel presented 11 lay witnesses. They presented Dr. Patel, their expert. The jury heard the vast majority of the evidence on which Holberg now relies. The package they presented in their theme of the case is one that was based on reasonable investigation and based on their experience in those courtrooms, and it's worth noting that when counsel makes the statement that my colleague referred to and that this court referred to in its opening statements, what they're saying there is that we know there are two questions. The first question is the state's burden, and we believe the state's going to fail in that burden, so we don't need to address that one right now, and we know that because of what they say in closing arguments. This is the reporter's record, 25th volume, page 206. I told you in a very brief opening statement, I didn't believe you would deliberate on the issue of mitigating evidence because I do not think you would find that Brittany would be a continuing threat to society, but just as we talked about various things in the guilt and innocence phase, we talked about various things in Ward Dyer. I want to talk to you about the issue of mitigating evidence and discuss those things with you and then spend half their closing argument discussing the mitigation case. As I've mentioned, I discussed the new evidence now relied on by Holberg. It is, frankly, most of it's bled by the record. A lot of it's repetitive. Ultimately, what it comes down to is not an unknowing or unintelligent decision by trial counsel, but an intentional decision made to present the case they did. As the lower court found, despite lengthy and extensive examination during the evidentiary hearing, Holberg's state habeas counsel were unable to identify any potentially mitigating aspects of Holberg's background with which Holberg's defense team were unfamiliar. For both claims, Holberg has had almost 30 years to develop them. She has been afforded extensive review in state and federal courts, and yet she cannot overcome the deference now owed under AEDPA to overturn her conviction and sentence for the savage assault and brutal murder of an 80-year-old man. For these reasons, the director asks you to affirm the lower court's decision. Thank you, counsel. Roboto? Thank you, Your Honor. Very briefly on a couple of points addressed by my learned colleague on behalf of the director. On the Strickland-Wiggins issue, counsel argues that, in fact, the record shows that trial counsel did a thorough investigation, and he points to early interviews that were conducted with the parents about Ms. Holberg's household and family life. If you look at the state court's findings of the habeas proceedings, the state court found that what they told trial counsel was that Ms. Holberg had a largely normal childhood. The trial counsel didn't believe that was true, and the trial court felt they needed to investigate further. Now, they then talked to the paternal grandfather, who wasn't there, but who told them about what he understood from the biological father who was there. The state court found as a fact that trial counsel wanted to talk to the biological father, thought it was important. They knew where he was. These are all in the state court's findings. They knew where he was. He was incarcerated. They never talked to him. That is not a thorough investigation, and, in fact, the failure to address the evidence that was right in front of them left them without what, to borrow a phrase I think from Andrus, a tidal wave of mitigating evidence about the family history of abuse, substance abuse, and also the— I guess we've gone over it. I mean, his primary answer is there's 180 pages of mitigation they did assemble, and then they made a tactical decision that this jury at that time would be more sympathetic if it were portrayed as a woman without all these difficulties who has a single moment of violence. I don't think, Your Honor, that you can judge whether or not the investigation and presentation was objectively reasonable and that a competent lawyer would have done what they did simply by counting pages of notes or by counting interviews. If you look at the record, and we cited, I think, the relevant pages in our brief, the vast majority of the investigation that was done was Gilder innocence, and there were some incidental questions of witnesses about things that would be relevant to— I'm going to shift you just because the Texas attorney has— they're an outstanding office, and he has very commendably narrowed the issue, at least in my framework. It's down to materiality and whether we would say the determination that this isn't material violates clearly established law, and we all know what materiality is, Kyle B. Whitley. What he says, for example, he particularly highlights that Ms. Holbrook herself ends up on the stand and apparently reiterated that she was forced to or cross-examined and said she'd actually taken the money, so the felony murder point might not have turned on Kirkpatrick. What are your responses to this not being material evidence? Well, I have to first candidly acknowledge that I'm not sure which testimony Counsel for the Director is referring to, and it's not cited in his brief when this issue is discussed, but I think that Ms. Kirkpatrick's testimony certainly was material to the penalty, and I want to note that although Counsel for the Director said that Ms. Kirkpatrick was not referred to in the penalty phase, in fact the expert on future dangerousness for the state specifically relied on her testimony about what Ms. Holbrook allegedly said as an important element in his opinion that she did pose a danger of future dangerousness. I think that's certainly material, and if you look at the arguments, there are a number of instances where her testimony is referred to even when she's not referred to by name, and it was the Texas Court of Criminal Appeals described her as a key witness for the prosecution. As Your Honor observed, finishing with her doesn't mean she wasn't a key witness,  10 pages of explosive alleged admissions can be hugely impactful and hugely material. So we're still talking about Kirkpatrick. I have one question about Kirkpatrick. Kirkpatrick, of course, gave a deposition where she recanted all of her testimony, and that deposition was subject to a fact-finding in state habeas. The deposition recounted her interactions with various police officers, DA Farron, Sergeant Hudson, Corporal Stallings, with respect to her being taken out of the cell and put back in the cell and all these things. The state habeas court found that her deposition testimony was, quote, not credible. Now, if we actually do have a Brady claim with respect to Kirkpatrick, can we, the court, rely on those fact findings? I think you can rely on the fact findings. Again, not to be repetitive, Your Honor, but I think the Brady issue is whether there's a reasonable probability that the jury would have seen the testimony differently if Kirkpatrick had been impeached with her informant status. We have fact findings about Kirkpatrick who said that the DA removed her from her cell, met with her alone, returned to her cell, et cetera, et cetera, et cetera. Corporal Stallings, his testimony, we have fact findings with respect to that deposition, to those statements by Kirkpatrick. And we have a state habeas court fact finding that her deposition recanting all that testimony is not credible. Again, I can only reassure you that the Brady issue is what the jury was reasonably likely to see about her testimony if she had been impeached. And is that, is your answer assumed that all those fact findings that I just talked about, those don't have anything to do with the Brady issue? I do not think they control the Brady issue because, again, it's the jury's determination in how they would have seen the evidence. Thank you, counsel. Thank you, Your Honor. We greatly appreciate the submissions from both sides on the cases submitted, and that concludes our cases for today. Thank you, Your Honor. Thank you.